IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

_____

ADRIAN RICCOTA,                    )
                                   )
      Plaintiff,                   )
                                   )
v.                                 )        No. 20-cv-1259-TMP
                                   )
COMMISSIONER OF SOCIAL             )
SECURITY ADMINISTRATION,           )
                                   )
      Defendant.                   )
_____

### ORDER AFFIRMING THE COMMISSIONER'S DECISION
_____

On November 17, 2020, Adrian Riccota filed a Complaint seeking judicial review of a social security decision.[1] (ECF No. 1.) Riccota seeks to appeal a final decision of the Commissioner of Social Security ("Commissioner") denying his application for Title II and XVI disability benefits. (ECF No. 16 at PageID 1783.) For the following reasons, the decision of the Commissioner is AFFIRMED.

### I.    BACKGROUND

### A.    Procedural History

_____

[1]After the parties consented to the jurisdiction of a United States magistrate judge on August 30, 2021, this case was referred to the undersigned to conduct all proceedings and order the entry of a final judgment in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (ECF No. 13.)

On October 15, 2018, Riccota protectively filed an application for a period of disability and disability insurance benefits under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 404-434, and for supplemental security income ("SSI") under Title XVI of the Act, 42 U.S.C. §§ 1381-1385. (ECF No. 16 at PageID 1783.) The applications, which alleged an onset date of May 15, 2018, were denied initially and on reconsideration. (Id.) Riccota then requested a hearing, which was held before an Administrative Law Judge ("ALJ") on February 26, 2020. (Id.) In a hearing decision issued on March 24, 2020, the ALJ found that Riccota was not disabled under sections 216(i) and 223(d) of the Act. (R. 26.)

On October 6, 2020, the Social Security Appeals Council denied Riccota's request for further review. (R. 1-6.) Riccota has exhausted his administrative remedies, and the ALJ's decision stands as the final decision of the Commissioner. Under section 205(g) of the Act — 42 U.S.C. § 405(g) — judicial review of the Commissioner's "final decision" is available if requested within sixty days of the mailing of the decision. Riccota timely filed the instant action. (ECF No. 1.)

**B.   The ALJ's Decision and the Five-Step Analysis**

After considering the record and the testimony given at the hearing, the ALJ used the five-step analysis set forth in the Social Security Regulations to conclude that Riccota was not

disabled. <u>See</u> C.F.R. § 404.1520(a); (R. 26.) That five-step sequential analysis is as follows:

> 1. An individual who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.
>
> 2. An individual who does not have a severe impairment will not be found to be disabled.
>
> 3. A finding of disability will be made without consideration of vocational factors, if an individual is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the regulations.
>
> 4. An individual who can perform work that he has done in the past will not be found to be disabled.
>
> 5. If an individual cannot perform his or her past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

<u>Petty v. Comm'r of Soc. Sec.</u>, No. 1:14-cv-01066-STA-dkv, 2017 WL 396791, at *2 (W.D. Tenn. Jan. 30, 2017) (citing <u>Willbanks v. Sec'y of Health & Human Servs.</u>, 847 F.2d 301 (6th Cir. 1988)). "The claimant bears the burden of proof through the first four steps of the inquiry, at which point the burden shifts to the Commissioner to 'identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity.'" <u>Warner v. Comm'r of Soc. Sec.</u>, 375 F.3d 387, 390 (6th Cir. 2004) (quoting <u>Jones v. Comm'r of Soc. Sec.</u>, 336 F.3d 469, 474 (6th Cir. 2003)).

At the first step, the ALJ found that Riccota had engaged in substantial gainful activity from April 2019 to June 2019. The ALJ summarized his step one findings as follows:

> Verified earning records show that the claimant was hired by NPC International, Inc. on October 19, 2018. He testified that in this position, he was delivering pizzas for Pizza Hut. After he was hired, the claimant earned $1,924.00 and $2,783.00 during the fourth quarter of 2018 and the first quarter of 2019. He then went on to earn $3,934.00 during the second quarter of 2019. In 2018, substantial gainful activity was $1,180.00 per month and it increased to $1,220.00 per month in 2019. The claimant's earnings during the fourth quarter of 2018 and the first quarter of 2019 did not rise to the level of substantial gainful activity. However, his earnings during the second quarter of 2019 did reach substantial gainful activity.
>
> The claimant testified that he worked until August 2019. During his seven-month period of employment after his alleged onset date, he did not note any special work conditions, assistance from others, special equipment, irregular hours, rest periods, lower productivity standards, or special relationships with his employers in the above positions. This period of substantial gainful activity does not constitute an unsuccessful work attempt.

(R. 13.) (internal citations omitted.) However, the ALJ found that "there ha[d] been a continuous 12-month period[] during which the claimant did not engage in substantial gainful activity," and the ALJ's subsequent findings and analysis concerned this period of time. (R. 13.)

At the second step, the ALJ concluded that Riccota had the following severe impairments: "obesity, status post lumbar fusion, asthma, and tachycardia." (R. 13.)

At the third step, the ALJ concluded that Riccota's impairments do not meet or medically equal, either alone or in the aggregate, the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 15.) The ALJ considered three listings: 1.04 (disorders of the spine), 3.03 (Asthma), and 4.05 (recurrent arrhythmias). (Id.)

The ALJ found that Riccota's spinal disorder did not meet or medically equal section 1.04 for the following reasons:

> The record evidence fails to demonstrate a nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss accompanied by sensory reflex loss, and positive straight leg raising in both the sitting and supine positions (1.04A). Furthermore, the record evidence fails to establish spinal arachnoiditis (1.04B) or lumbar spinal stenosis with pseudoclaudication (1.04C). Accordingly, the undersigned finds that the claimant's spinal disorder fails to meet or medically equal listing level severity.

(Id.) The ALJ found that Riccota's asthma did not meet listing 3.03 because "there is no evidence that the FEV1 values are met or that the claimant has frequent asthma attacks requiring physician intervention and occurring at least once every two months (or at least six times per year)." (Id.) The ALJ also found that Riccota's tachycardia did not meet Listing 4.05 for the following reasons:

> The undersigned notes the claimant's recurrent arrhythmias are not related to reversible causes, such as electrolyte abnormalities, digitalis glycoside, or antiarrhythmic drug toxicity. The claimant has failed to demonstrate uncontrolled and recurrent episodes of cardiac syncope or near syncope, despite being on prescribed treatment. He has also not presented

-5-

> documented evidence of a resting or ambulatory (Holter) electrocardiography, or by other appropriate medically acceptable testing, coincident with occurrence of syncope or near syncope. Accordingly, the claimant tachycardia does not rise to the level of severity contemplated by listing 4.05.

(Id.) The ALJ also considered Riccota's clinical obesity and found it to be "severe." (Id.) However, the ALJ found that "the signs, symptoms, and laboratory findings of [Riccota's] obesity are not of such severity as found in any listing." (R. 15-16.)

When a claimant's impairments do not meet or equal a Listed Impairment, an assessment of their residual functional capacity ("RFC") is conducted, based on all the relevant medical and other evidence in the case record. 20 C.F.R. § 404.1520(e). The RFC is used at step four and, if necessary, step five in the process. First, at step four, it is used to determine whether the claimant can perform their past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), (f). If a claimant has the RFC to perform their past relevant work, they are not disabled. 20 C.F.R. § 404.1520(a)(4)(iv). The ALJ found that Riccota had the RFC to perform light work except no lifting from below the waist. (R. 16.) Additionally, "[h]e could stand and walk for 45-minute intervals for 2 to 4 hours per day and sit in 1-hour intervals for 6 hours per day. The claimant can occasionally perform postural activities. He should avoid concentrated exposure to extreme temperature, vibrations, fumes, dust, gases, and inhalants." (Id.)

The ALJ found that based on Riccota's RFC, he was unable to perform any past relevant work. (R. 24.)

In reaching the RFC determination, the ALJ discussed Riccota's testimony and the medical evidence in the record. The ALJ summarized Riccota's testimony as follows:

> In his Disability Report, the claimant alleged that his ability to work was limited by a back injury. He stated that he stopped working on May 15, 2018 because of his conditions. The claimant completed a function report and alleged that he experienced constant, intense, stabbing pain that made it impossible to stand, bend, lift, stoop, or sit for longer than 15 minutes at a time. When questioned why he could not return to work that he had done in the past, he responded that he could not do this work because he could not walk or sit down for more than 30 to 40 minutes at a time, lift more than 20 to 30 pounds, and lift anything from below his knees without assistance. Then, when asked what would prevent him from working a job where he was primarily sitting and did not have to lift more than 20 pounds or do any bending, the claimant responded that if he sits for approximately 40 minutes to 1 hour, he experiences pain near his tailbone.

(R. 16-17) (internal citations omitted). Although Riccota testified during his hearing that he experienced frequent asthma attacks, particularly at night, the ALJ found that the "evidence fails to show that the claimant received regular treatment for his asthma or tachycardia and he did not follow up with a pulmonologist or a cardiologist." (R. 20.) The ALJ concluded that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of

these symptoms are not entirely consistent with the medical evidence and other evidence in the record. . ."   (R. 17.)

The ALJ then considered Riccota's medical records and treatment history, stating: "while there may be some mention of treatment, symptoms, and limitations in the medical evidence of record, the undersigned finds a lack of persuasive evidence that such limitations were placed on the claimant by any qualified treating medical source." (R. 22.)

Prior to his alleged onset date, Riccota was diagnosed with lumbar stenosis and herniated nucleus puposus with right lower extremity radiculopathy. (R. 17.) On February 28, 2018, he had an MRI of his lumbosacral spine that showed findings consistent with severe lumbar spondylosis with a very large disc herniation at the L4-L5 level and to a lesser degree, at the L5-S1 level. (Id.) On April 25, 2018, Riccota was admitted to the hospital under the neurosurgery service and underwent L4-L5 decompression with right medial facetectomy and foraminotomy, right L4-L5 discectomy, and L4-S1 instrumented fusion. (R. 17-18.) After this operation, Riccota continued to allege moderately severe low back pain that radiated to his hips and buttocks, but he denied that it radiated to his legs. (R. 18.)

Riccota reported that he was able to start a new job after his surgery and was working upwards of sixty hours per week before he began experiencing a resurgence in his back pain. (Id.) As a

result, Riccota started receiving pain management in October 2018 and his treatment included injection therapy and medication. (Id.) During his initial visit, he received a sacroiliac injection and was prescribed Diclofenac, Baclofen, and Amitriptyline. (Id.) Two months later, in December 2018, he told Melani Sidwell, NP that that the injection had not helped his low back pain, but instead, worsened it, and that the Diclofenac, Baclofen, and Amitriptyline that she prescribed at his last visit had not helped his symptoms. (Id.) As a result, Nurse Practitioner Sidwell prescribed Riccota 400 mg of Gabapentin three times per day and indicated that he should follow-up in two months. (Id.)

Two months later, on February 5, 2019, the claimant presented for a pain management appointment with Matthew Fabian, M.D. and alleged experiencing 6/10 pain in his lower back, with associated bilateral lower extremities muscle spasms. (Id.) Dr. Fabian indicated that Riccota exhibited 5/5 strength in his bilateral lower extremities with hip flexion extension, knee flexion extension, and ankle plantar dorsiflexion. (Id.)

As a result of Riccota's continued reports of back pain, he had a bilateral lumbar medial branch block injection on February 20, 2019. (Id.) Riccota stated that the injection immediately provided him with eighty-five percent relief and a month later he was experiencing fifty percent ongoing relief. (R. 18-19.) At this time, he was prescribed 600 mg of Gabapentin three times per day,

1000 mg of Nabumetone twice per day, and 1500 mg of Robaxin. (R. 19.) Riccota ambulated with a non-antalgic gait and without the use of assistive devices, demonstrated 5/5 strength in his bilateral lower extremities, his sensation to light touch was preserved, and had an equivocal straight leg raise. (Id.)

After his initial application was denied, Riccota alleged that his back pain had gotten worse and that he was now experiencing pain that was moving down his right leg into his knee. (Id.) On April 10, 2019, he received another bilateral lumbar medial branch block injection. (Id.) Two months later, at a visit with Nurse Practitioner Hannah Paige Livingston, Riccota reported that the injections did not help his pain and that his pain was affecting his job and how much he was able to work. (Id.) Riccota stated that he was no longer taking his prescribed medication because he did not make enough money to pay for medication that was not working. (Id.) He also declined a course of physical therapy because of the costs and expressed frustration regarding his lack of relief following his spinal surgery. (Id.) Nurse Practitioner Livingston observed that his physical examination remained unchanged with respect to his gait, strength, and sensation; however, his straight leg raise was positive bilaterally. (Id.) Nurse Practitioner Livingston gave Riccota an intramuscular injection of Depo Medrol and scheduled him for a right sacroiliac injection. (Id.)

-10-

On July 17, 2019, Riccota received another Depo Medrol injection. Prior to the injection, he exhibited 4+/5 bilateral hip flexion and extension. (Id.) On September 27, 2019, Riccota received another bilateral lumbar medical branch block and reported more than ninety percent relief initially. (Id.) Two months later he reported sustained eighty percent relief. (Id.) On November 26, 2019, Riccota expressed that he felt that blocks were beginning to wear off but continued to rate his pain as a 3/10. (Id.) He also stated that his pain was moderately alleviated by the medications Flexeril, Mobic, and Tramadol. (Id.) Given his excellent pain relief, Nurse Practitioner Livingston scheduled him to have a lumbar radiofrequency ablation on December 27, 2019. (Id.)

After the radiofrequency ablation, on January 29, 2020, the claimant's bilateral lower extremities hip flexion and extension increased to 5/5, but he alleged that his pain had returned and he described it as "excruciating." (R. 20.) As a result, Dr. Fabian administered a right medial branch block and radiofrequency ablation. (Id.) The same day, Riccota presented for an evaluation, arranged by his attorney, with Dr. Samuel Chung, D.O. (R. 20.) The ALJ summarized Dr. Chung's findings as follows:

> Dr. Chung examined the claimant and noted that the active range of motion in his dorsolumbar and cervical spine was abnormal, he had a positive straight leg raise on the left while in the seated position, decreased sensation to light touch bilaterally, 4+/5 strength in

the plantarflexion of the left foot, and 1+ Achilles reflex bilaterally. The examiner added that the claimant demonstrated a slightly antalgic gait with increasing weight bearing on the right lower extremity during the stance phase of the gait cycle. However, there was no evidence of any kyphosis of the thoracic spine or extreme lordosis of the lumbar spine, and his Spurling sign was negative on either side of his neck. Additionally, the claimant's seated straight leg raise was negative in the right lower extremity, his bilateral deep tendon reflexes of the patella and medial hamstring were normal bilaterally, and all his other sensory examinations were within normal limits, including his right L3, L4, and sacroiliac. The claimant maintained bilateral 5/5 muscle strength on the hip flexors, knee extensors, and dorsiflexion of the feet and the examiner indicated that he did not require the use of an assistive device for ambulation. At the end of the examination, Dr. Chung diagnosed the claimant with residual from post laminectomy syndrome status post L4-S1 two level lumbar arthrodesis with persistent discogenic back pain, left S1 lumbar radiculopathy, left sacroiliitis, and lumbar facet arthropathy of multiple levels of L3 down to S1 bilaterally. The physician also noted that the claimant had a history of ADD, asthma, gastroesophageal reflux disease, and marijuana/tobacco abuse.

(Id.) (internal citations omitted).

The ALJ also considered the findings of two State medical examiners, Dr. Thomas Thrush, M.D. and Dr. Javier Torres, M.D., who reviewed all of Riccota's medical records as part of his benefit application.[2] (R. 24.) The ALJ also considered the reports of two State agency psychological consultants, Dr. Larry Welch, Ed.D. and Dr. Paula Kresser. Drs. Welch and Kresser found that

---

[2]Although the ALJ does not summarize the findings of the medical consultants, he does cite to specific details of their findings when determining their persuasiveness.

-12-

"the claimant's mental impairments did not cause more than mild limitations in any area of mental functioning." (R. 22.)

The ALJ then looked at all of the medical evidence holistically, without "any specific evidentiary weight, including controlling weight, to any prior administrative medical finding(s) or medical opinion(s), including those from [Riccota's] medical sources." (Id.) The ALJ found Dr. Thrush and Dr. Torres's opinions to be persuasive. However, the ALJ found that Dr. Thrush's opinion "that the claimant could frequently climb stairs, balance, kneel, and crawl" failed "to account for the exacerbating effects of his obesity on his comorbidities." (Id.) Additionally, the ALJ stated that "[t]he postural limitations provided by Dr. Torres are more consistent with the preponderance of all the evidence, but the evidence does not support the physician's assessment that the claimant could only stand and/or walk for a total of 2 hours." (Id.)

The ALJ found that the psychological reviews of Drs. Welsh and Kresser were "consistent with the preponderance of the evidence, which shows that the claimant was never psychiatrically hospitalized and his mental impairments were well managed by his primary care provider and medications." (Id.)

However, the ALJ found Dr. Chung's opinion "not persuasive, as it is inconsistent with the preponderance of all the evidence,

is not supported by the claimant's own subjective reports, and is internally [in]consistent." (R. 23.) The ALJ explained that:

> First, there is no evidence that the claimant alleged or contended with manipulative limitations that would render him only able to occasionally handle, finger, and feel. During Dr. Chung's examination, he noted some decreased sensation in the claimant's lower extremities, but he stated that all other sensory examinations ere within normal limits. While he had some decreased abduction in his left shoulder, his bilateral elbow flexion and extension were normal, as was his bilateral wrist flexion and extension, and the claimant's right shoulder range of motion was normal. Dr. Chung's own examination of the claimant's upper extremities fail to support his restrictive manipulative limitations. Second, while Dr. Chung stated that the claimant could never use either foot to operate foot controls, he also stated that the claimant could occasionally operate a motor vehicle, which requires the operation of foot controls. Further, there is no evidence that the claimant had a treating relationship with Dr. Chung, his representative arranged the examination, and the record indicates that the physician only examined him on a single occasion. Therefore, the undersigned finds that Dr. Chung's opinion is not persuasive.

(Id.) (internal citations omitted). In light of this evidence, the ALJ concluded that Riccota has the RFC to perform light work with the limitations described above. (R. 16.) A vocational expert assessed that "the exertional demands of the claimant's past relevant work as a tire builder and construction worker [] exceed the residual functional capacity . . . the claimant could not return to his past relevant work in these positions." (R. 24.)

Finally, at step five, the ALJ found that "considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant

numbers in the national economy that the claimant can perform." (R. 24.) The ALJ explained that "[Riccota's] ability to perform all or substantially all of the requirements of [light work] has been impeded by additional limitations." (Id.) The vocational expert testified that, considering these limitations along with Riccota's age, education, RFC, and work experience, Riccota would be able to perform the requirements of representative occupations, such as "inspector," "packager," and "assembler." (R. 25.) Based on this testimony, the ALJ concluded Riccota "is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (Id.)

On appeal, Riccota argues that the ALJ erred at step one by finding that he had engaged in substantial gainful activity when working at Pizza Hut, that the ALJ should have found that Riccota met Listing 1.04, that the ALJ did not afford Dr. Chung's examination the correct weight under the regulations, and that the ALJ improperly granted weight to DDS source forms and statements from non-examining reviewing experts.

## II.  ANALYSIS

### A.  Standard of Review

Under 42 U.S.C. § 405(g), a claimant may obtain judicial review of any final decision made by the Commissioner after a hearing to which they were a party. "The court shall have power to enter, upon the pleadings and transcript of the record, a judgment

affirming, modifying, or reversing the decision of the
Commissioner of Social Security, with or without remanding the
cause for a rehearing." 42 U.S.C. § 405(g). Judicial review of the
Commissioner's decision is limited to whether there is substantial
evidence to support the decision and whether the Commissioner used
the proper legal criteria in making the decision. Id.; Cardew v.
Comm'r of Soc. Sec., 896 F.3d 742, 745 (6th Cir. 2018); Cole v.
Astrue, 661 F.3d 931, 937 (6th Cir. 2011); Rogers v. Comm'r of
Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007). Substantial evidence
is more than a scintilla of evidence but less than a preponderance,
and is "such relevant evidence as a reasonable mind might accept
as adequate to support a conclusion." Kirk v. Sec'y of Health &
Human Servs., 667 F.2d 524, 535 (6th Cir. 1981) (quoting Richardson
v. Perales, 402 U.S. 389, 401 (1971)).

    In determining whether substantial evidence exists, the
reviewing court must examine the evidence in the record as a whole
and "must 'take into account whatever in the record fairly detracts
from its weight.'" Abbott v. Sullivan, 905 F.2d 918, 923 (6th Cir.
1990) (quoting Garner v. Heckler, 745 F.2d 383, 388 (6th Cir.
1984)). If substantial evidence is found to support the
Commissioner's decision, however, the court must affirm that
decision and "may not even inquire whether the record could support
a decision the other way." Barker v. Shalala, 40 F.3d 789, 794
(6th Cir. 1994) (quoting Smith v. Sec'y of Health & Human Servs.,

893 F.2d 106, 108 (6th Cir. 1989)). Similarly, the court may not try the case *de novo*, resolve conflicts in the evidence, or decide questions of credibility. Ulman v. Comm'r of Soc. Sec., 693 F.3d 709, 713 (6th Cir. 2012) (citing Bass v. McMahon, 499 F.3d 506, 509 (6th Cir. 2007)). Rather, the Commissioner, not the court, is charged with the duty to weigh the evidence, to make credibility determinations, and to resolve material conflicts in the testimony. Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 528 (6th Cir. 1997); Crum v. Sullivan, 921 F.2d 642, 644 (6th Cir. 1990).

## B.  Medical Opinion Evidence

Riccota argues that the ALJ did not follow applicable regulations when determining his RFC and that the ALJ's RFC determination was not supported by substantial evidence. Because both arguments involve the ALJ's consideration of medical opinion evidence, the undersigned addresses them together under the same heading.

As a preliminary matter, because Riccota filed his application for benefits after March 27, 2017, the ALJ was required to adhere to 20 C.F.R. § 404.1520c in considering medical opinions and prior administrative medical findings in the record. See Jones v. Berryhill, 392 F. Supp. 3d 831, 839 (E.D. Tenn. 2019). For claims filed before March 27, 2017, 20 C.F.R. § 404.1527 governs the evaluation of medical opinion evidence. The distinction is meaningful because the revisions to the regulatory language

-17-

"eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion." Lester v. Saul, No. 5:20CV1364, 2020 WL 8093313, at *10 (N.D. Ohio, Dec. 11, 2020), report and recommendation adopted by, 2021 WL 119287 (N.D. Ohio Jan. 13, 2021) (quoting Ryan L.F. v. Comm'r of Soc. Sec., No. 6:18-cv-01958-BR, 2019 WL 6468560, at *4 (D. Ore. Dec. 2, 2019)). In other words, claims filed on or after March 27, 2017, which fall under 20 C.F.R. § 404.1520c, are not subject to the "treating physician rule." Jones, 392 F. Supp. 3d at 839.

Much of Riccota's argument rests on precedent and cases decided under the old framework of strictly defined, hierarchical deference depending on the source of the medical opinion. (See ECF No. 16.) Many of Riccota's arguments lack merit because although he references § 404.1520c, he bases his arguments on standards set forth in § 404.1527 and cites exclusively to cases dealing with the evaluation of medical opinion evidence under the prior regulatory language. For example, Riccota states that "[Dr. Chung's] findings and opinions are entitled to the most weight, since he had all of the records and an opportunity to examine the claimant, and is the exactly appropriate specialist," (id. at PageID 1787-88), argues that the ALJ improperly afforded weight to opinions of the agency medical consultants, (id. at 1800), and claims that "the ALJ must assign and explain the weight afforded medical opinions in the record," (id. at 1796). Riccota also

asserts that "[t]he Regulation requires that all medical opinions will be weighed, regardless of source" and that "failure to do so is error requiring reversal." (Id. at 1797.) The changed approach contained in 20 CFR 404.1520c, Riccota argues, is a "dilution of the [articulation] requirements" for weighing medical opinion evidence. (Id.)

This court has routinely rejected identical arguments regarding the new regulations. See, e.g., Harris v. Comm'r of Soc. Sec., No. 21-cv-1071-tmp, 2022 WL 1516319, at *7 (W.D. Tenn May 13, 2022) (Pham, M.J.); Lee v. Comm'r of Soc. Sec., No. 1:20-cv-01175-JAY, at *8 (W.D. Tenn. Feb. 17, 2022)(York, M.J.); Hart v. Comm'r of Soc. Sec., 1:20-cv-01126-ATC, at *18-19 (W.D. Tenn. Sept. 21, 2021)(Christoff, M.J.); Strawn v. Comm'r of Soc. Sec., No. 20-cv-1065-TMP, 2021 WL 3487176, at *9-10 (W.D. Tenn. Aug. 9, 2021)(Pham, M.J.). The changes contained in 20 C.F.R. § 404.1520c do not represent the "dilution" of a previous standard, but instead a wholly reoriented approach towards medical opinion evidence. "We will not defer or give *any* specific evidentiary weight, including controlling weight, to *any* medical opinion{s} or prior administrative medical finding(s), including those from your medical sources." 20 C.F.R. § 404.1520c(a) (emphasis added). Instead, ALJs now "articulate [their] determination or decision [of] how persuasive [they] find all of the medical opinions and all of the prior administrative medical findings" in the record.

-19-

Id. Persuasiveness is judged based on the consideration of any medical opinion's supportability, consistency, relationship with the claimant, and specialization. 20 C.F.R. § 404.1520(b)-(c). Other factors that may be considered include the opinion source's familiarity with the other evidence in the claim, and experience with program policy and requirements. Id. The ALJ is only required to explain "how [they] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings" in order to comply with the regulation. 20 C.F.R. § 404.1520(b)(2); see also Strawn, 2021 WL 3487176, at *10 ("Accordingly, the ALJ was not obligated to show greater deference to the opinions of the treating sources than those of the consultative and non-examining sources. Rather, the ALJ needed only consider the persuasiveness of each opinion.") (internal citations omitted).

Here, the ALJ followed the law. The ALJ explained that Dr. Chung's opinion was "not persuasive," because it was "not supported by the claimant's own subjective reports and is internally [in]consistent." (R. 23.) For example, Dr. Chung stated that Riccota could never use either foot to operate foot controls, however, he also stated that Riccota could occasionally operate a motor vehicle, which requires the operation of foot controls. (Id.) The ALJ found the opinions of Drs. Thrush and Torres to be persuasive. (Id.) Although he did not summarize the findings of

-20-

these specialists, he noted that "Dr. Thrush's opinion that the claimant could frequently climb stairs, balance, kneel, and crawl, fails to account for the exacerbating effect of his obesity on his comorbidities. The postural limitations provided by Dr. Torres are more consistent with the preponderance of all the evidence, but the evidence does not support the physician's assessment that the claimant could only stand and/or walk for a total of 2 hours." (Id.) For every medical opinion, the ALJ properly followed the regulatory procedures, and was well within his role in finding other opinions more persuasive than Dr. Chung's.

Riccota makes a more specific argument regarding the opinions of Drs. Thrush and Torres, who served as the State agency's medical consultants and conducted an administrative review of Riccota's file. (Id.) Riccota contends that "[i]t is error to give weight to the form reports of DDS agency reviewers who we now know are often unqualified and make millions apparently signing off on reports of non-medical agency sources." (ECF No. 16 at PageID 1799.) Riccota alleges that these opinions are functionally worthless, as they are only "based on a few minutes' review of prepared files." (Id.) In support of these allegations, Riccota provides and summarizes a recent *Tennessean* article focusing on administrative contractors such as Drs. Thrush and Torres. (ECF Nos. 16 at PageID 1799-1800, 16-1.) This court has previously considered this exact same argument, involving the same article and Dr. Thrush (as well as

-21-

Dr. Chung) in Lucy v. Saul, No. 19-1083-TMP, 2020 WL 1318803 (W.D.

Tenn. Mar. 20, 2020). In that case, the court said the following:

> This court has an extremely limited role in the Social
> Security disability determination process: to evaluate
> whether the ALJ's decision was supported by substantial
> evidence and whether the ALJ used the correct legal
> criteria to make his or her decision. See, e.g., Cardew
> v. Comm'r of Soc. Sec., 896 F.3d 742, 745 (6th Cir.
> 2018). It is not free to restructure the disability
> determination process to suit its policy preferences.
> Similarly, the court generally cannot consider evidence
> outside of the administrative record, such as newspaper
> articles. Miller v. Comm'r of Soc. Sec., 811 F.3d 825,
> 839 (6th Cir. 2016). Under governing regulations, "an
> ALJ is permitted to rely on state agency physician's
> opinions to the same extent as she may rely on opinions
> from other sources." Reeves v. Comm'r of Soc. Sec., 618
> F. App'x 267, 274 (6th Cir. 2015). Governing regulations
> also permit ALJ's to consider program knowledge. 20
> C.F.R. § 404.1527(c)(6). Lucy's objection is not
> supported by law.

Lucy, 2020 WL 1318803, at *7. Riccota makes identical arguments,

and the court's prior analysis adequately addresses Riccota's

claims as well. The court is unable to consider these claims in

its review. Regardless, the record makes clear that the ALJ went

beyond administrative findings and considered the evaluations of

Dr. Chung and Riccota's medical history as well. Because the ALJ

explained his supportability and consistency findings regarding

all of these medical opinions, Riccota's argument that an examining

physician's opinion is afforded greatest weight is unavailing.

(ECF No. 16 at PageID 1799.)

    Beyond arguing against allegedly misapplied legal criteria,

Riccota also argues that the ALJ's decision was not supported by

substantial evidence. As discussed above, substantial evidence is more than a scintilla of evidence but less than a preponderance, and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Kirk, 667 F.2d at 535. Riccota seemingly argues against this well-established precedent in full, suggesting that "[t]he unfavorable opinions [the ALJ] bases a denial upon must be supported by a *preponderance of the substantial evidence* and free from significant factual error and legal." (ECF No. 16 at PageID 1801) (emphasis added).

This construction has no support in case law. Riccota's argument confuses the operating standard imposed on ALJs and the agency, who must base their opinions on a preponderance of the evidence, and the standard of review imposed on reviewing courts, who must uphold the ALJ's initial decision if it is supported by substantial evidence. ALJ's make their decisions based on "a preponderance of the evidence." 20 C.F.R. § 416.1453. At the Appeals Council level, decisions are also reviewed on the "preponderance of the evidence" standard. 20 C.F.R. § 416.1479. But once a case is appealed to federal court, "if the administrative findings are supported by substantial evidence, they are conclusive, and a reviewing court may not reweigh the evidence or substitute its judgment for that of the administrative fact-finder, even if the reviewing court views the evidence as preponderating otherwise." Powell v. Schweiker, 514 F. Supp. 439,

450 (M.D. Fla. 1981); 42 U.S.C. § 405(g). This approach is supported by a mountain of case law. See Cardew, 896 F.3d at 745-46; Blakley, 581 F.3d at 406. Riccota's assertions to the contrary are not accurate.

With the correct "substantial evidence" standard established, the court must evaluate Riccota's arguments regarding an alleged lack of substantial evidence in the ALJ's opinion. First, Riccota argues that the opinions of Drs. Thrush and Torres cannot be "substantial evidence," seemingly as a matter of law. (ECF No. 16 at 1800) ("Richardson clearly holds that to be substantial evidence, opinions must at least be from examiners, and we urge within the reporter's area of expertise.") The ALJ's decision here was based on more than just the administrative reviewers' assessments, as discussed above. But even were it not so, Riccota's wider proposition overreads Richardson far beyond its pages. Richardson itself contemplated the use of "medical adviser[s]" to provide evidence, even those who had not examined the patient but nonetheless examined their records and gave an opinion as to their condition. See Richardson, 402 U.S. at 408. Further, federal regulations require ALJs to evaluate administrative medical evidence "because our Federal or State agency medical or psychological consultants are highly qualified and experts in Social Security disability evaluation." 20 C.F.R. §§ 404.1513a(b)(1). As a matter of law, these opinions must at

-24-

least be considered. Where the ALJ finds them substantiated and consistent, they are within their role in finding them persuasive as well.

Lastly, Riccota functionally asks the court to reweigh the evidence and credit the opinion of Dr. Chung more than the ALJ did. (ECF No. 16 at PageID 1799) ("We respectfully urge that fair evaluation of the medical source opinion, which this Court has considered many times, leads only to the finding that Dr. Johnson's[3] opinion is entitled to the greatest weight.") The court cannot. Blakely, 581 F.3d at 406 ("the substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts") (citing Mullen v. Bowen, 800 F.2d 535, 545 (6th Cir. 1986)). The undersigned finds that the ALJ adhered to the regulations in considering medical opinion evidence, and that the record provides substantial evidence to support the ALJ's decision.

**C.  Whether Substantial Evidence Supported the ALJ's Step One Finding**

Riccota challenges the ALJ's finding at step one that he performed "substantial gainful activity" at Pizza Hut. He argues

---

[3]The undersigned believes that Riccota is referring to Dr. Chung here and that the reference to Dr. Johnson is a typographical error. There is no other reference to a "Dr. Johnson" in the administrative record.

that the ALJ overlooked a letter from his manager, which he argues
shows that he worked under "special conditions" during his time at
that job. The letter states:

> To whom it may concern. Adrian Ricotta [sic] was an employee
> of mine at Pizza Hut in Henderson. He worked for me for 1
> year. He was a great employee always came to work on time
> however, I could not work him very much he was unable to due
> [sic] heavy lifting and complete a task in a timely manner.
> He could not bend down so I could not schedule him to work
> alone. As time went on he would sit down to get the job done
> and still would not get it done. Adrian got worse the longer
> he worked here. If you have any questions please contact me.

(R. 214.) This letter was not mentioned in the ALJ's opinion.

"Substantial gainful activity is work activity that is both
substantial and gainful." Cardew, 896 F.3d at 746 (quoting 20
C.F.R. § 404.1572)). "Substantial work activity is work activity
that involves doing significant physical or mental activities."
Id. (quoting 20 C.F.R. § 404.1572(a)). "Gainful work activity is
work activity that you do for pay or profit." Id. (quoting 20
C.F.R. § 404.1572(b)). In general, the Commissioner looks to five
factors to determine whether a claimant has the ability to work at
the substantial gainful activity level: (1) the nature of the
claimant's work; (2) how well the claimant performs; (3) whether
the claimant's work is done under special conditions; (4) whether
the claimant is self-employed; and (5) time the claimant spent in
work. Id. (citing 20 C.F.R. §§ 404.1573(a)-(e)).

If the claimant "is unable, because of their impairments, to
do ordinary or simple tasks satisfactorily without more

-26-

supervision or assistance than is usually given other people doing similar work, this may show that they are not working at the substantial gainful activity level." Id. (quoting 20 C.F.R. § 404.1573(b)). Moreover, if the claimant's "work is done under special conditions, [the Commissioner] may find that it does not show that [the claimant] has the ability to do substantial gainful activity." Id. (quoting 20 C.F.R. § 404.1573(c)). This section also states that "work done under special conditions may show" that a claimant has "the necessary skills and ability to work at the substantial gainful activity level." Id.

20 C.F.R. § 404.1573(c) lists examples of special conditions that may relate to an impairment:

> (1) [Claimant] required and received special assistance from other employees in performing [their] work;
>
> (2) [Claimant] w[as] allowed to work irregular hours or take frequent rest periods,
>
> (3) [Claimant] w[as] provided with special equipment or w[as] assigned work especially suited to [their] impairment;
>
> (4) [Claimant] w[as] able to work only because of specially arranged circumstances, for example, other persons helped [them] prepare for or get to and from [their] work;
>
> (5) [Claimant] w[as] permitted to work at a lower standard of productivity or efficiency than other employees"; or
>
> (6) [Claimant] w[as] given the opportunity to work despite [their] impairment because of family

> relationship, past association with [their] employer,
> or [their] employer's concern for [their] welfare.

Separately, 20 C.F.R. § 404.1574 provides "several guides" to determine whether the claimant is "able to do substantial gainful activity." Cardew, 896 F.3d at 747. "An overarching consideration in determining whether a claimant has engaged in substantial gainful activity is the amount of compensation he earned." Id. The relevant regulation states: "Generally, in evaluating your work activity for substantial gainful activity purposes, our primary consideration will be the earnings you derive from the work activity . . . . Generally, if you worked for substantial earnings, we will find that you are able to do substantial gainful activity." 20 C.F.R. § 404.1574(a)(1). The regulations likewise set income thresholds that establish compensation floors. See id. § 404.1574(b).

However, "[t]he mere existence of earnings over the statutory minimum is not dispositive." Cardew, 896 F.3d at 747 (quoting Keyes v. Sullivan, 894 F.2d 1053, 1056 (9th Cir. 1990)). Instead, when a claimant earns income above the floor, a presumption arises that they have engaged in substantial gainful activity. Id. A claimant may rebut the "presumption" based on gross earnings in two ways. Id. First, the regulations provide a framework to subtract subsidized earnings and impairment-related work expenses from gross earnings. Id. (citing 20 C.F.R. §§ 404.1574, 1576).

Adjusting for subsidized earnings based on special conditions attendant to the claimant's position is particularly appropriate where special conditions are easily quantified. Id. "For example, when a person with a serious impairment does simple tasks under close and continuous supervision, our determination of whether that person has done substantial gainful activity will not be based only on the amount of the wages paid." 20 C.F.R. § 1574(a)(2). Rather, "[w]e will first determine whether the person received a subsidy; that is, we will determine whether the person was being paid more than the reasonable value of the actual services performed." Id. "We will then subtract the value of the subsidy from the person's gross earnings to determine the earnings we will use to determine if he or she has done substantial gainful activity." Id.

Second, "the presumption may be rebutted in a rare case where a claimant's adjusted income does not demonstrate that he has the 'ability to engage in substantial . . . activity,' or 'work activity that involves doing significant physical or mental activities.'" Cardew, 896 F.3d at 748 (quoting 20 C.F.R. § 404.1572(a); citing 20 C.F.R. §§ 404.1573(b), 404.1574(b)(2)). "The presumption may be rebutted based on the claimant's performance, 20 C.F.R. § 404.1573(b), or the special conditions attached to his work, id. § 404.1573(c), where the subsidy and impairment-related work expense framework does not adequately

-29-

account for these factors." Cardew, 896 F.3d at 748 (citing Boyes v. Sec'y of Health & Human Servs., 46 F.3d 510, 512 (6th Cir. 1994) (reversing and awarding benefits because "[a]ny presumption that the work constituted substantial gainful activity created by the level of money [he] earned is destroyed" given his performance and "the special conditions under which he performed his work")). "Whether the claimant's work history demonstrates his ability to engage in substantial gainful activity requires a holistic analysis of a variety of factors, guided but not dictated solely by income in all cases, and tailored to the medical and vocational evidence in an individual claimant's case." Id. (internal citations omitted).

In this case, the ALJ found that Riccota's earnings during the second quarter of 2019 reached the level of substantial gainful activity. (R. 13.) The ALJ stated that "[d]uring [Riccota's] seven-month period of employment after his alleged onset date, he did not note any special work conditions, assistance from others, special equipment, irregular hours, rest periods, lower productivity standards, or special relationships with his employers in the above positions." (Id.) The ALJ did not refer to the letter from Riccota's employer at Pizza Hut, which described several "special conditions" contemplated by 20 C.F.R. § 404.1573(c). For example, the letter stated that because Riccota could not bend down, his employer "could not schedule him to work

-30-

alone." (R. 214.) Additionally, "he was unable to [do] heavy lifting and complete a task in a timely manner." (Id.) Although substantial evidence could arguably otherwise support the ALJ's finding that Riccota engaged in substantial gainful activity, the ALJ failed to analyze any of the "special conditions" listed in § 1573(c) before or after engaging in a subsidy analysis under § 1574. However, the ALJ's error is harmless. At step five, the ALJ also found that Riccota could perform other work found in the national economy for the period between his alleged onset and the ALJ's decision (a period that includes the three month period that the ALJ found him to be not disabled because he participated in substantial gainful activity). (R. 24.) Because the ALJ's no disability decision at step five is supported by substantial evidence, the ALJ's failure to consider the "special conditions" at step one is harmless error. See Soto v. Comm'r of Soc. Sec., No. 1:15 CV 1484, 2016 WL 3692125, at *7 (N.D. Ohio, Jul. 12, 2016).

**D.   Whether Substantial Evidence Supported the ALJ's Step Three Finding**

Riccota argues briefly that the ALJ erred in finding that Riccota does not meet Listing 1.04.[4] In support of this argument, Riccota states:

_____

[4]On December 3, 2020, the Social Security Administration revised the medical criteria for evaluating musculoskeletal disorders. 85 FR 78164 (Dec. 3, 2020). Under the revised Listings, Listing 1.04

Dr. Chung opined the inability to walk a block at a
reasonable pace on rough or uneven surfaces, use public
transportation, or climb a few steps at a reasonable
pace with the use of a single handrail, which indicates
the musculoskeletal listings in effect at the time of
the decision would be met.

(ECF No. 16 at PageID 1793.)

At step three of the sequential evaluation process, the
claimant has the burden of establishing a condition that satisfies
the requirements of an impairment listed in 20 C.F.R. Part 404,
Subpart P, Appendix 1 (the Listings). See 20 C.F.R. §§ 404.1505,
404.1520, 416.905, 416.920; Foster v. Halter, 279 F.3d 348, 354
(6th Cir. 2001). Because the Listings permit a finding of
disability based solely on medical evidence (without considering
a claimant's vocational profile), the Commissioner applies a
heightened evidentiary standard at step three. Lee v. Comm'r of
Soc. Sec., 529 F. App'x 706, 710 (6th Cir. 2013). To establish an
impairment that meets a Listing, a claimant must present "specific
medical evidence to satisfy all of the criteria" of the
Listing. Perschka v. Comm'r of Soc. Sec., 411 F. App'x 781, 786
(6th Cir. 2010) (citing 20 C.F.R. § 416.925). An impairment that

---

has been replaced by Listing 1.15, which has different criteria.
Compare, 85 FR 78164 *78179-80, with 20 C.F.R. pt. 404, Subpt. P.,
App. 1 § 1.04 (2019). The revised Listings were effective April 2,
2021, and were only given prospective application. 85 FR 78164
*78164. Listing 1.04 was in effect when the ALJ rendered his
decision on March 24, 2020, and it still applies to Riccota's case.

manifests only some of the criteria, no matter how severely, does not qualify. See Sullivan v. Zebley, 493 U.S. 521, 530 (1990).

If the claimant presents sufficient evidence to raise a "substantial question" at step three, "[a]n administrative law judge must compare the medical evidence with the requirements for Listed Impairments in considering whether the condition is equivalent in severity to the medical findings for any Listed Impairment." Reynolds, 424 F. App'x at 415. Additionally, the ALJ looks to the opinions of the State agency medical advisors and/or the opinion of a testifying medical expert for guidance on the issue of whether the claimant's impairment is the medical equivalent of a Listing. See 20 C.F.R. § 404.1526(c) and (d); SSR 17-2p, 2017 WL 3928306, at *3-4 (Mar. 27, 2017); Deters v. Sec'y of Health, Educ. & Welfare, 789 F.2d 1181, 1186 (5th Cir. 1986). The Sixth Circuit has instructed that when an ALJ finds that a claimant does not meet or medically equal a specific Listing, the ALJ must actually evaluate the evidence, compare it to the section of the Listing at issue, and give an explained conclusion, in order to facilitate meaningful judicial review. Reynolds, 424 F. Appx. at 415-16. "Without it, it is impossible to say that the [ALJ's] decision at Step Three was supported by substantial evidence." Id. at 416 (citing Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 120 (3d Cir. 2000); Senne v. Apfel, 198 F.3d 1065, 1067 (8th Cir. 1999); Clifton v. Chater, 79 F.3d 1007, 1009 (10th Cir.

-33-

1996)). However, the Sixth Circuit has also held that if there are sufficient factual findings elsewhere in the ALJ's opinion, those findings are sufficient to support their conclusion at step three. Forrest v. Comm'r of Soc. Sec., 591 F. App'x 359, 366 (6th Cir. 2014); Bledsoe v. Barnhart, 165 F. App'x 408, 411 (6th Cir. 2006) (looking to findings elsewhere in the ALJ's decision to affirm a step-three medical equivalency determination and finding no need to require the ALJ to "spell out every fact a second time").

Here, the ALJ determined that Riccota had the following severe impairments: "obesity, status post lumbar fusion, asthma, and tachycardia." (R. 13.) However, the ALJ concluded that these impairments did not meet or medically equal the severity of a Listed Impairment. (Id.) Specifically, the ALJ stated, "No treating or examining physician has mentioned findings equivalent in severity to the criteria of any Listed Impairment, nor does the evidence show medical findings that are the same or equivalent to those of any listed impairment." (R. 15.) Specifically in regard to Listing 1.04, the ALJ stated:

> The claimant's spinal disorder fails to meet or medically equal section 1.04. The record evidence fails to demonstrate a nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss accompanied by sensory reflex loss, and positive straight leg raising in both the sitting and supine positions (1.04A). Furthermore, the record evidence fails to establish spinal arachnoiditis (1.04B) or lumbar spinal stenosis with

-34-

pseudoclaudication (1.04C). Accordingly, the undersigned finds that the claimant's spinal disorder fails to meet or medically equal listing level severity.

(Id.)

Riccota does not identify which section of the Listing he believes he meets, nor does he provide any evidence that he fulfills the requirements of Listing 1.04. This argument is not sufficiently developed and is therefore waived. See Leary, 528 F.3d at 449; see also Rogers, 486 F.3d at 247 ("It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") Further the undersigned finds that the ALJ's determination that Riccota did not meet a Listing under 20 CFR § 404.1520(a)(4)(iii) is supported by substantial evidence.

### III. CONCLUSION

For the reasons above, the decision of the Commissioner is AFFIRMED.

IT IS SO ORDERED.

s/ Tu M. Pham
TU M. PHAM
Chief United States Magistrate Judge

August 2, 2022
Date